UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SUZETTE J.,[1]

   Plaintiff,

v.         Civil Action No. 2:23cv341

MARTIN O'MALLEY
COMMISSIONER OF
SOCIAL SECURITY,

   Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Suzette J. seeks judicial review of the Commissioner of Social Security's denial of her claim for disability benefits ("DIB") under the Social Security Act ("the Act"). Plaintiff argues that the ALJ did not properly evaluate her subjective complaints of pain, and failed to explain why her migraines did not meet or medically equal a listed impairment. Plaintiff also contends that the ALJ failed to discuss how her migraines were considered in determining her residual functional capacity ("RFC"). As a result, she argues that the ALJ's RFC is not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

72(b) of the Federal Rules of Civil Procedure. This Report finds no error in the ALJ's assessment of the evidence and therefore recommends that the Court deny Plaintiff's motion for summary judgment, (ECF No. 9), and affirm the final decision of the Commissioner.

## I.   PROCEDURAL BACKGROUND

On May 11, 2021, Plaintiff filed for DIB, alleging that she became disabled on February 15, 2016. (R. 105). Because her prior DIB application was denied on October 31, 2018, Plaintiff amended her alleged disability onset date to November 1, 2018, the day after her previous denial.[2] (R. 17). Plaintiff's new application was also denied initially and on reconsideration. (R. 104, 114, 133, 144). Plaintiff then requested an administrative hearing. (R. 170). The hearing was held by telephone on June 13, 2022. (R. 49-80). Counsel represented Plaintiff at the hearing, and a vocational expert ("VE") testified. Id.

On November 1, 2022, the ALJ denied Plaintiff's claim for DIB, finding she was not disabled during the period alleged—from November 1, 2018, the amended alleged disability onset date, through December 31, 2021, the date Plaintiff was last insured

---

[2] Plaintiff previously applied for DIB on November 17, 2016, alleging disability beginning on February 15, 2016. (R. 84). Plaintiff's application was denied initially and on reconsideration. (R. 84). After a hearing, an ALJ denied Plaintiff's claim on October 31, 2018. (R. 81-98). She did not contest that denial in federal court.

for DIB. (R. 17-39). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 25). The ALJ found that Plaintiff could perform work within the national economy as a data entry clerk, registration clerk, and information clerk. (R. 37—38). On May 23, 2023, the Appeals Council denied Plaintiff's request for review. (R. 1).

On July 14, 2023, Plaintiff filed her complaint in this court. Compl. (ECF No. 1). Plaintiff seeks judicial review of the Commissioner's final decision that she was not entitled to an award of DIB, claiming that "[t]he agency committed error of law by denying Appeals Council review of the decision by the Administrative Law Judge," and "[t]he conclusions and findings of fact of the Defendant are not supported by substantial evidence and are contrary law and regulation." Id. at ¶¶ 4, 8.

On December 11, 2023, Plaintiff moved for summary judgment. Pl.'s Mot. Summ J. (ECF No. 9). Plaintiff filed a brief in support of her Motion for Summary Judgement, (ECF No. 10), and later filed two Amended Briefs, (ECF Nos. 12, 13). The Court will consider Plaintiff's most recent Amended Brief, as it represents a comprehensive filing. Pl.'s Second Amended Br. in Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 13). Plaintiff argues that the case should be reversed and remanded because the

ALJ did not properly evaluate her subjective complaints of pain under SSR 16-3p and prevailing law. Id. at 1. Plaintiff also contends that the ALJ failed to explain why her migraines did not meet or medically equal Listing 11.02, and did not discuss how her migraines were considered in formulating the RFC. Id. at 15.

On January 10, 2024, the Commissioner opposed Plaintiff's motion. Def.'s Mem. Supp. Commissioner's Decision & Opp'n Summ. J. ("Def.'s Opp'n") (ECF No. 14).[3] The Commissioner argues that the ALJ properly evaluated Plaintiff's subjective complaints in crafting the RFC and properly considered Plaintiff's migraine headaches under the listings and in her determination. Id. at 19, 26. Plaintiff replied. ("Pl.'s Reply") (ECF No. 15). After a review of the record, this Report considers each of these arguments.

## II.  FACTUAL BACKGROUND

Plaintiff was born on August 20, 1965, and at the time of the ALJ's decision, she was 57 years old. (R. 105). Plaintiff met the insured status requirements under the Social Security

---

[3]   In opposing Plaintiff's motion, the Commissioner did not move for summary judgment. However, under the new Supplemental Rules for Social Security Actions, effective December 1, 2022, appeals from final decisions of the Social Security Administration are presented for decision by the parties' briefs. Supp. R. Soc. Security Actions Under 42 U.S.C. § 405(g), Rule 5. As both parties have filed their briefs on this matter pursuant to the undersigned's Briefing Order, (ECF No. 6), this matter is ripe for review notwithstanding the absence of cross-motions for summary judgment. To the extent the Commissioner's brief, (ECF No. 14), seeks summary judgment in the Commissioner's favor, the undersigned recommends that the court GRANT the motion.

Act until December 31, 2021, her date last insured ("DLI").   (R. 20).   She did not engage in substantial gainful activity from November 1, 2018, the day after the prior unfavorable ALJ decision, through her DLI.   (R. 21).   She has a high school education and reported past work as a customer service representative, bank teller, and bank teller supervisor.   (R. 56-58, 231-34, 249, 283-85).

## A.   Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of her medical history as she alleges she became disabled on November 1, 2018, and her DLI was December 31, 2021. (R. 17).   Because Plaintiff sought DIB, she was required to prove that her impairments became disabling, as defined in 42 U.S.C. § 423(d), prior to her DLI.   See Harold L.M. v. Kijakazi, No. 1:22cv3787, 2023 WL 6283367, 2023 U.S. Dist. LEXIS 172972, at *38 (D.S.C., July 19, 2023.   The Court will evaluate her medical records from November 1, 2018, through December 31, 2021.[4]

### 1.   Migraine-Related Treatment

On January 28, 2019, Plaintiff had a follow-up appointment for migraines at Tidewater Neurologists, Inc. and Sleep Disorder Specialists with Eric Goldberg, M.D.   (R. 358).   Plaintiff

---

[4] The Court may also consider Plaintiff's treatments since December 31, 2021, to the extent that they support her alleged impairments from November 1, 2018, through December 31, 2021.   Bird v. Comm'r of SSA, 699 F.3d 337(4th Cir. 2012).

reported "significant neck and low back pain," migraine headaches, and vertigo. Id. Dr. Goldberg noted that Plaintiff was seeing a pain management doctor and received steroid injections. Id. Plaintiff complained of "headache[s], visual changes, parathesias, dizziness, weakness, gait, [and] pain." Id. She denied incoordination. Id. Dr. Goldberg summarized Plaintiff's prior laboratory studies, including a repeat MRI of her brain that "showed a single nonspecific T2 hyperintensity unchanged," an MRI of her cervical spine that "showed a possible area of some extra fluid as well as a C5-6 disc bulge," and an MRI of her lumbosacral spine that "showed her prior fusion surgery at L3-4 as well as degenerative disc disease L4-5 L5-S1 and effusions in those areas." Id. Plaintiff's neurological examination was normal and unchanged. Id. Plaintiff was "[s]till permanently out of work," and Dr. Goldberg recommended a follow-up appointment in six months. Id. Dr. Goldberg continued Plaintiff on her current medications and treatment. Id.

Six months later, on July 29, 2019, Plaintiff had a follow-up appointment with Dr. Goldberg for migraines. (R. 368). Plaintiff reported a "recent increase in frequency in her migraine headache symptomatology," and stated she was experiencing everyday headaches and blurry vision with intermittent dizziness. Id. She complained of "visual changes,

imbalance, dizziness, weakness, speech, gait, [and] pain." Id. She denied incoordination. Id. Dr. Goldberg prescribed Plaintiff a "retrial of Topamax 100 mg at bedtime for headache prevention [and] titration Fioricet as needed." Id. Her neurological examination was normal and unchanged. Id. Plaintiff was still out of work, and Dr. Goldberg again recommended a follow-up in six months. Id.

Plaintiff saw Dr. Goldberg on February 3, 2020. (R. 340). She complained of "headache[s], visual changes, parathesias, imbalance, weakness, gait, [and] pain." Id. Her neurological examination was normal and unchanged. Id. Dr. Goldberg increased her Topamax prescription for "bedtime" headache prevention. Id. He recommended a follow-up appointment in two to three months. Id.

Seven months later, on September 18, 2020, Plaintiff had an appointment with Dr. Goldberg and complained of "worsening migraine symptoms and persistent back pain issues exacerbated by a recent fall in which she broke her ankle." (R. 352). Plaintiff was using crutches to treat her ankle injury. Id. Plaintiff complained of "pain, headaches, gait, dizziness, [and] vertigo." Id. She denied "swallow, visual changes, weakness, speech, syncope, [and] tinnitus." Id. Dr. Goldberg noted Plaintiff's desire to learn the cause of her tremor, essential tremor migraine headaches, and vertigo. (R. 353). Dr. Goldberg

7

increased Plaintiff's Topamax dose to 300 mg daily (100 mg in the morning and 200 mg at night), and prescribed Plaintiff with a Medrol dose pack and Mobic as needed.  Id.  Dr. Goldberg stated that he would do a CT scan of Plaintiff's brain, and recommended that she follow-up in six weeks.  Id.

On November 16, 2020, Plaintiff had a follow-up with Dr. Goldberg.  (R. 350).  Plaintiff reported frequent migraines but a "better tremor on [] the increased Topamax."  Id.  Plaintiff complained of fatigue, vertigo issues, headaches, visual changes, parathesias, imbalance, dizziness, and pain.  Id.  She denied "swallow, incoordination, incontinence, nausea, [and] seizure."  Id.  Dr. Goldberg observed that Plaintiff has vertigo, chronic pain, cervical lumbosacral radiculopathy, and "migraine headaches with persistent issues [and] no improvement [on] multiple different prevention medications."  (R. 351).  Dr. Goldberg started Plaintiff on Aimovig and continued her other medications and treatment.  Id.  Dr. Goldberg deferred Plaintiff's pain issues to her pain management doctor.  Id.  He recommended Plaintiff schedule a follow-up appointment in two to three months.  Id.

On February 22, 2021, Plaintiff saw Dr. Goldberg and reported "some vertigo issues," but her "migraine headaches were improved on Aimovig."  (R. 356).  But, Plaintiff "missed two doses [of Aimovig] due to insurance issues."  (R. 357).

Plaintiff stated "her dizziness is sometimes associated with palpitations," and she complained "of dizziness, vertigo, headaches, sleeping spells, [and] vision changes." (R. 356). She denied "swallow, incoordination, parathesias, imbalance, weakness, speech, gait, nausea, syncope, [and] vomiting. Id. Plaintiff had a recent increase in "dizziness, vision change with a question of a central or cardiogenic cause of her symptoms." (R. 357). Dr. Goldberg noted that Plaintiff has an upcoming appointment "with cardiology and [a] [Holter] monitor[5] and sleep study scheduled." (R. 356). Dr. Goldberg ordered an updated CT of her brain, and recommended Plaintiff consult ophthalmology, and follow-up with him in six weeks. (R. 357).

On April 5, 2021, Plaintiff met with Dr. Goldberg. (R. 1762). Plaintiff stated her medication was "not working for her," and reported "episodes of syncope loss of consciousness[,] left eye blurry vision and eye twitching [with] intermittent headache symptomatology ... and diffuse muscle twitching." Id. Plaintiff complained "of incoordination, parathesias, imbalance, weakness, [and] speech." Id. Her neurological examination had one finding "of note ... a right drift." Id. Dr. Goldberg explained that Plaintiff's blurry vision could be a complication

---

[5] On May 11, 2021, Erica Formato, M.D., at Sentara Family Medicine reviewed Plaintiff's Holter monitor testing. (R. 1071). She noted that the results had not been "reviewed by a cardiologist but per the read, it was overall normal. The basic heart rhythm was normal with only a few episodes of extra beats during the duration of wearing the monitor." (R. 1072).

of her migraines.   (R. 1763).   Dr. Goldberg stated he would "do a head CT,"[6] and defer her cardiac issues to cardiology.   Id.   He recommended Plaintiff follow-up in six weeks.   Id.

On May 10, 2021, Plaintiff had an appointment with Dr. Goldberg and reported "intermittent episodes of syncope up to two times a day almost daily."   (R. 360).   Plaintiff explained that "she sometimes has twitching before her syncopal episodes." Id.   Plaintiff stated she was feeling dizzier and experiencing "vertigo lately."   Id.   She complained "of headaches, blurry vision, vertigo, dizziness, [and] syncope."   Id.   Her neurological examination was normal and unchanged.   Id.   Dr. Goldberg stated that he would do an "ambulatory EEG," and "defer her cardiac issues to cardiology."   (R. 361).   He increased Plaintiff's Topamax prescription to 150 mg in the morning and 200 mg at night.   Id.   Plaintiff was "still restricted to no driving," and Dr. Goldberg recommended a follow-up in six weeks. Id.

Plaintiff returned to Dr. Goldberg for a follow-up appointment on July 12, 2021.   (R. 1380).   Dr. Goldberg noted that Plaintiff reported "still with eye movement issues and syncope as well [as] frequent migraines."   Id.   She complained of "headache[s], visual changes, [and] parathesias."   Id.   Her

---

[6] On July 21, 2021, Dr. Goldberg found that Plaintiff's "[b]loodwork was normal, EEG and Doppler were normal, [and the] CT was unremarkable."   (R. 1380).

neurological examination was normal and unchanged. Id. As previously noted, Dr. Goldberg reviewed Plaintiff's laboratory testing and opined that her "[b]loodwork was normal, EEG and Doppler were normal, [and her] CT was unremarkable." (R. 1380). Plaintiff's Holter monitor and ambulatory EEG results were pending at this time. Id.

A few months later, on September 20, 2021, Plaintiff had another follow-up appointment with Dr. Goldberg. (R. 1382). Plaintiff reported "stress depression symptomatology," and "episodes of syncope." Id. Plaintiff had "not seen cardiology." Id. She complained of "headache[s], visual changes, parathesias, speech, [and] memory loss." Id. Her neurological examination was normal and unchanged. Id. Dr. Goldberg opined that Plaintiff's Holter monitor showed SVT [supraventricular tachycardia],[7] her bloodwork was normal, her EEG and Doppler were normal, her CT was unremarkable, and her ambulatory EEG "captured several events nonepileptic in nature." (R. 1382). Dr. Goldberg continued to restrict Plaintiff to no driving, and prescribed Plaintiff Lexapro for stress and depression. (R. 1383). He recommended Plaintiff follow-up in two to three months. Id.

---

[7] SVT is a rapid heart rate (tachycardia). See U. Mich. Frankel Cardiovascular Ctr., *Supraventricular Tachycardia (SVT)*, https://www.umcvc.org/conditions-treatments/supraventricular-tachycardia-svt. (last visited Feb. 27, 2024).

On October 18, 2021, Plaintiff had an appointment at Sentara Cardiology Specialists with Ashley Rice, NP, for an evaluation of her complaints of syncope. (R. 1472). Plaintiff explained that she "[p]asses out every day" even "while sitting." (1473). Plaintiff's Holter revealed SVT, and she noted that she has palpitations daily. (R. 1473-74). NP Rice opined that Plaintiff's "[s]yncopal spells sound more neurological with nystagmus prior to passing out [and] she is currently under neurological work up." (R. 1473). NP Rice noted Plaintiff's other risks factors include her LDL, uncontrolled blood pressure, hemoglobin levels, and her body mass index. (1473-74). NP Rice noted that Plaintiff is morbidly obese. (R. 1473).

On examination, NP Rice found that Plaintiff had no acute distress and a regular heartbeat and rhythm. (R. 1477). She had a normal range of motion in her neck, upper extremities, and lower extremities, and her eye extraocular movement was normal. (R. 1477-78). She was alert and oriented to person, place and time, but reported depression and anxiety. (R. 1478). NP Rice prescribed Plaintiff Atenolol for her blood pressure, SVT, and migraines. (R. 1483). NP Rice ordered an EKG, echocardiogram, stress test, and chest CT for Plaintiff. (R. 1479-80). The EKG reveled normal sinus rhythm. (R. 1479). The echocardiogram, completed on October 27, 2021, demonstrated normal right

ventricular systolic function, normal left ventricular systolic function with an ejection fraction of 55% by Simpson's biplane, normal left and right atrial chambers, no valve stenosis, and no pericardial effusion. (R. 1688-92). Plaintiff's stress test revealed normal perfusion images; no regional wall motion abnormalities; normal left ventricular systolic function with ejection fraction 74%; and no transient ischemic dilatation. (R. 1678-87). The CT of Plaintiff's chest showed no pulmonary artery filling defects; normal diameter of the main pulmonary artery; normal heart size; no pericardial effusion; mild regions of dependent atelectasis in the lungs and a small linear band of opacity in the right middle lobe, scar versus subsegmental atelectasis; patent major airways; no enlarged lymph nodes; nothing acute in the upper abdomen; and scatted osseous degenerative changes with no acute or aggressive osseous abnormalities identified. (R. 1675-77).

Although outside of her DLI, Plaintiff also directs the Court to an appointment with Dr. Atienza at Virginia Oncology Associates on July 19, 2022. (R. 1791). Plaintiff was evaluated for macrocytosis,[8] and noted that she feels extreme fatigue "and will suddenly pass out." (R. 1791). She stated that her episodes are "sometimes ... precipitated by rapid eye

_____

[8] Macrocytosis is enlarged red blood cells. <u>See</u> Mayo Clinic, *Macrocytosis: What causes it*, Expert Answer by Rajiv K. Pruthi, M.B.B.S., https://www.mayoclinic.org/macrocytosis/expert-answers/faq-20058234. (last visited Feb. 27, 2024).

movement before she has syncope." _Id._  Plaintiff reported that Dr. Goldberg said, "it may be seizure activity." _Id._  On examination, Plaintiff denied "headache[s], double vision, balance problems, sensory changes or motor weakness." (R. 1792). She had a regular heart rate and rhythm. _Id._  Dr. Atienza reviewed Plaintiff's "consistently stable labs," and instructed Plaintiff to "track the number of her seizure-like/syncope episodes." (R. 1796). Plaintiff had macrocytosis, but normal hemoglobin and a normal white blood and platelet count. (R. 1807). Dr. Atienza found Plaintiff was stable overall and no intervention was required. (R. 1808).

## B.  Dr. Goldberg's Medical Source Statement

In July, 2022—six months after her DLI—Dr. Goldberg completed a medical evaluation for Plaintiff on a checkbox-style form. (R. 1545–47). Dr. Goldberg indicated that Plaintiff has a medical condition that causes pain and reaches "levels of severity that would likely affect ... [her] concentration/memory and distractibility." (R. 1545). Dr. Goldberg stated that Plaintiff's pain and/or fatigue results in frequent, once per day, incapacitation ("i.e., inability to perform in a work setting"). _Id._  Dr. Goldberg did not provide an explanation for these findings, or cite to any of his treatment notes.

The checkbox form also included a "[m]edical statement regarding hand & wrist problems," and Dr. Goldberg concluded

that Plaintiff's medical conditions impair the use of her hands. (R. 1545—46). Dr. Goldberg opined that Plaintiff could "never" use her hands for fine or gross manipulation. (R. 1546). He further found that Plaintiff is presently unable to perform fine and gross movements effectively. Id. The form provided examples of fine and gross movements, including preparing a simple meal and feeding oneself, taking care of personal hygiene, sorting and handling papers or files, and placing files in a file cabinet at or above waist level. Id. Dr. Goldberg stated that Plaintiff suffers from severe pain. Id.

Dr. Goldberg concluded that Plaintiff could never continuously lift or carry weight up to five pounds, which was the most severe limitation option included on the check-box style form. (R. 1547). He stated that Plaintiff is unable to use either hand for repetitive simple grasping, repetitive pushing and pulling of arm controls, and repetitive fine manipulation. (R. 1547).

C.   Treatment Related to Plaintiff's Muscoskeletal Impairments

Between November 2018 and December 2021, Plaintiff regularly received treatment for muscoskeletal symptoms and pain from providers at the Orthopaedic & Spine Center. (R. 520–663). Plaintiff was primarily treated by surgeon Jeffrey Carlson, M.D., and pain management specialist Jenny Andrus, M.D. Id.

15

On November 8, 2018, Plaintiff had an appointment with Dr. Carlson for back pain associated with L4-5 spondylolisthesis. (R. 520).  Plaintiff received an epidural for her L4-5 spondylolisthesis and reported that it "seemed to help."  Id. Plaintiff was standing and walking "quite a bit better."  Id. Plaintiff had "no numbness, no weakness, and no bowel or bladder dysfunction."  Id.  She was "quite happy with the results of the epidural," and expressed that she had "not had this kind of improvement with a shot in the past."  Id.

On examination, Plaintiff's thoracolumbar spine had normal kyphosis, normal appearance, and no scoliosis.  (R. 521).  She had full range of motion of her spine, hips, knees, and ankles. Id.  Her straight leg raising and crossed straight leg raising tests were negative, and she had no weakness in her thoracic, lumbar, sacral spine, lower extremities, or hips.  Id.  Her deep tendon reflexes were present and normal bilaterally, and her ankle and knee jerks were normal with no clonus.  Id.  Dr. Carlson noted that "[a]t this point, she has done better with the epidural steroid injection," and he did "not suggest any further intervention."  Id.  Dr. Carlson told Plaintiff "that she should begin a weight loss program," and schedule a follow-up appointment in three months.  (R. 521-22).

On November 17, 2018, Plaintiff met with Dr. Andrus at the Orthopaedic & Spine Center for neck pain and headaches.  (R.

523). Plaintiff explained that her headaches "began after an automobile accident in July 2015," and she was under the care of neurology. Id. Plaintiff described the pain occurring in her occiput, neck, and left shoulder. Id. She also complained of "nausea and vision changes, with [] headache[s] and report[ed] a diagnosis of migraines." Id. Plaintiff noted back and leg pain. Id. Dr. Andrus observed that Plaintiff had a permanent spinal cord stimulator implanted, but experienced continued discomfort and saw Dr. Carlson who sent her for an epidural "which did help." Id. Plaintiff described her pain level at worst a 9/10, at best a 6/10, and on average a 7/10. Id. Plaintiff experienced numbness and tingling in her left leg and weakness in her back and leg. Id. She described her pain "as throbbing, numb, shooting, pressure, gnawing, sharp, aching, and tingling." Id. Plaintiff stated her pain is "continuous and makes her feel frustrated with impact on her sleep, daily activities, and work." Id. She reported that medication "and lying down seems to help." Id. Plaintiff had physical therapy in 2017 for her neck and received dry needling. Id. Dr. Andrus summarized her records as follows:

> Prior treatments: She has spondylolisthesis at the L4-5 level. Epidural seemed to help. Lumbar myelogram showed advanced facet arthrosis at the L4-5 level, but patent neutral foramen and XLIF interbody spacer at L3-4 with solid osseous fusion.

**Review of Systems**: Pertinent positives include blurred vision, dizziness, double vision, headache, ringing in ears, weight change, changes in mood, depression, difficulty swallowing, indigestion, joint pain, loss of balance, memory loss, muscle weakness and numbness/tingling.   Pertinent negatives include chest pain, chills, cold, discharge of the eyes, fever, hearing loss, heart murmur, itching of the eyes, palpitations, redness of the eyes, rheumatic fever, sore throat/hoarseness, abdominal pain, anxiety, bipolar disorder ... incontinence, joint stiffness, nausea/vomiting, pain on breathing ... Raynaud's phenomenon, rheumatoid disease, seizure disorder, shortness of breath sprain/strain, swelling of feet, tendonitis, varicose veins and wheezing.

(R. 523-24).   On physical examination, Plaintiff was alert and oriented, and her mood and affect were normal.   (R. 525).   She had normal light touch sensation in the bilateral upper and lower limbs, full strength both proximally and distally in her arms and legs, and no gross abnormalities in her range of motion or in the stability of her head, neck, trunk, and all four extremities, "except for decreased range of the cervical spine in extensions with tenderness in the left cervical paraspinals." (R. 525-26).   Plaintiff's "[u]pper motor neuron signs [were] positive bilaterally with Hoffman sign positive in both hands." (R. 525).   Dr. Andrus recommended that Plaintiff be evaluated for stenosis at the C5-6 level and undergo a cervical stenosis evaluation.   (R. 526).   Dr. Andrus observed that Plaintiff had upper extremely hyperreflexia, migraine headaches, and chronic back and leg pain "status post permanent spinal cord stimulator implantation."   Id.   Dr. Andrus recommended sphenopalatine

ganglion blocks for Plaintiff's migraines. Id. A sphenopalatine ganglion block was performed on December 10, 2018, December 17, 2018, and January 7, 2019, for her migraine headaches. (R. 527-532).

On January 22, 2019, Plaintiff had a follow-up appointment with Dr. Andrus. (R. 533). Plaintiff stated that the sphenopalatine ganglion blocks did not help, and described "her pain as aching, throbbing, shooting, gnawing, sharp, tender, tiring, nagging, numb, and miserable." (R. 533). Her pain was predominately in her neck. Id. She rated her pain level a 10/10 at worse and a 7/10 at best. Id. She stated her pain "is worse with sitting, standing, walking, and improves with medications, resting, and [applying a] heating pad which helps up to 60%." Id. Plaintiff reported severe functional deficits but denied pain radiating to her arms. Id. When reviewing Plaintiff's symptoms, Dr. Andrus noted "[p]ertinent negatives include chills, weight change, gout, loss of balance, seizure disorder and swelling of feet." Id. On examination, Plaintiff was alert and oriented, and her affect and mood were normal. (R. 535). She had normal light touch sensation, "5/5 strength both proximally and distally in the bilateral upper and lower limbs," and full range of motion "except for decreased range of motion of the cervical spine in extension with tenderness in the left cervical paraspinals." Id. Her "[u]pper motor neuron

signs [were] negative bilaterally with negative Hoffman signs in the hands." Id. Dr. Andrus recommended Plaintiff "undergo medical branch blocks for left neck pain," but noted she has "some mild listhesis at that level ... [and] would not consider RFA necessarily." (R. 536).

Plaintiff returned to Dr. Andrus on June 6, 2019, and reported neck, back, and leg pain. (R. 549). Plaintiff had trigger point injections, but they "did not seem to help very much." Id. She rated her pain level an 8-9/10, and noted that her pain was worse with sitting, standing, and lying down. Id. She stated nothing "really" alleviates her pain. Id. Dr. Andrus noted that Plaintiff has chronic neck pain, chronic back pain status post permanent spinal cord stimulator implantation, post-laminectomy pain syndrome, a component of SI joint mediated pain, and obesity. (R. 551–552). On examination, Plaintiff was alert and oriented with normal light touch sensation, negative upper motor neuron signs with negative Hoffmann signs in her hands, and positive PSIS [posterior superior iliac spine] compression. Id. Dr. Andrus recommended SI injections and told Plaintiff to "meet with our Boston Scientific representative for reprogramming of the stimulator to see if we can get better improvement in her typical left leg pain." (R. 552).

On October 29, 2019, Plaintiff had an appointment with Dr. Andrus and was administered lumbar intraarticular facet joint

and SI joint injections. (R. 569-70). Later that year, on December 3, 2019, Plaintiff met with Dr. Andrus and reported that her back pain was "doing much better" since the injections. (R. 571). But, she still had "pain diffusely in her legs." Id. Plaintiff described "her pain as aching throbbing, shooting, stabbing, gnawing, sharp, burning, nagging, numb, and miserable." Id. She rated her pain level an 8/10 at worst, and a 7/10 at best. Id. She stated her pain "is worse with standing, sitting, and walking, and improves with lying down and a heating pad, which helps about 50%." Id. Plaintiff reported severe functional deficits, but "no new numbness, tingling, weakness, no bowel or bladder dysfunction, and no recent trauma or inciting event." Id. She reported "that for years she at times will feel like she is getting weak in her back and legs and will fall." Id. Plaintiff has a cane, but does not use it routinely. Id. Dr. Andrus noted that Plaintiff's SI joint pain was "much better after SI injection." (R. 573). Dr. Andrus gave Plaintiff "an order for a walker," and noted that she has routinely asked Plaintiff to use her cane. (R. 574). Dr. Andrus found that in "regard to her back pain, she is doing well," and the injections can be repeated as needed. Id.

On January 16, 2020, Plaintiff had a follow-up appointment at the Orthopaedic & Spine Center for lower back pain and bilateral lower extremity tingling. (R. 575). Plaintiff was

treated by Tonia Yocum, PA-C, and reported "that her lower back pain has gotten worse within the last month or so," and the numbness and fatigue in her legs was progressing. Id. Plaintiff was "in the process of finding a medical facility to issue her walker as well as her cane," and requested corticosteroid injections for her back. Id. On examination, Plaintiff had "no weakness in the thoracic, lumbar, or sacral spine or in the lower extremities or hips." (R. 577). Her deep tendon reflexes were normal and present, and her ankle and knee jerks were normal with no clonus. Id. Plaintiff had "tenderness around the bilateral PSIS and the bilateral greater trochanters." (R. 577). Plaintiff received an injection. Id.

A few months later, on March 2, 2020, Plaintiff met with PA-C Yocum for her lower back and bilateral hip pain. (R. 579). Plaintiff stated that her pain was disturbing her sleep, and she occasionally experienced numbness in her legs. Id. Plaintiff denied "weakness, loss of balance, or incontinence." Id. She noted that her "numbness occurs after only a few minutes of standing or walking," and was occurring more frequently. Id. PA-C Yocum noted that Plaintiff's bilateral PSIS corticosteroid injection, which was administered on January 16, 2020, seemed "to help her pain at that time." Id.

On March 5, 2020, Plaintiff had an appointment with Dr. Andrus. (R. 583). Her chief complaint was neck pain. Id. Dr.

Andrus found that Plaintiff "has failed back surgery syndrome
with chronic back and leg pain." Id. Plaintiff reported that
"[o]ver the last several weeks she has had insidious onset of
increased pain in her neck radiating into her left shoulder,
with intermittent numbness and tingling in her left hand." Id.
She rated her pain level at its worst a 9/10, and at its best an
8/10. Id. Plaintiff said her pain improves when lying down.
Id. She has "no new weakness, bowel or bladder dysfunction,
[or] recent trauma or inciting event." Id. Plaintiff reported
severe functional deficits. Id. On examination, Plaintiff was
alert and oriented, and her affect and mood were normal. (R.
585). She had normal light touch sensation in her bilateral
upper and lower limbs, and 5/5 strength both proximally and
distally in her bilateral upper and lower limbs. Id. Her
"[u]pper motor neuron signs [were] negative bilaterally with
negative Hoffman sign in the hands." Id. Her gait was
nonantalgic and she had a normal base. Id. Her extremities
revealed no gross abnormalities, "except for tenderness in the
left cervical paraspinals." Id. Plaintiff agreed to start
physical therapy for her neck and upper extremity symptoms. (R.
586).

On May 12, 2020, Plaintiff saw Dr. Carlson at Orthopaedic &
Spine Center for left wrist carpal tunnel syndrome. (R. 590).
Plaintiff explained that for the past several months, she has

experienced left-hand numbness and tingling.  Id.  The numbness
and tingling wakes her up at night, and at times her left-hand
twitches and causes her to "drop things."  Id.  Plaintiff stated
she was using a brace but did not make much progress.  Id.
Plaintiff had a right carpal tunnel release, and requested a
"left carpal tunnel release having failed conservative care."
(R. 592).

On June 3, 2020, Plaintiff had a left-hand carpal tunnel
release.  (R. 664).  Plaintiff followed up with Dr. Carlson on
June 19, 2020, and reported that her hand was doing much better
with better numbness and better grasping.  (R. 594).  Her hand
joint had full range of motion, and Dr. Carlson noted "she can
be as active as she feels comfortable."  Id.  Dr. Carlson stated
Plaintiff could follow-up "on an as-needed basis."  Id.

On August 27, 2020, Plaintiff saw PA-C Youcum and
complained of severe back and bilateral hip pain.  (R. 597).
She explained that her corticosteroid injections, facet
injection, and SI joint injections "do not really help."  Id.
But, her trigger point injections "help more."  Id.  She
requested corticosteroid injections for her back.  Id.
Plaintiff stated that her left hip and thigh were bothering her,
and she experienced "some numbness in her feet" which makes it
"painful for her to climb stairs."  Id.  She noted that her
spinal cord stimulator "does not seem to be helping that much,"

and she had her last adjustment at the beginning of 2020.  Id.
She reported not being very active due to pain.  Id.

On September 3, 2020, Plaintiff saw Dr. Andrus for neck and
back pain.  (R. 601).  She reported "more back pain radiating to
the left leg," worse "pain and numbness in her legs," neck pain
radiating to her shoulders, and severe functional deficits.  Id.
Dr. Andrus recommended a CT myelogram of Plaintiff's cervical
and lumbar spine "to evaluate for increased stenosis
contributing to her symptoms."  (R. 604).

On September 29, 2020, Plaintiff had a cervical and lumbar
CT myelogram.  (R. 611).  The following month, on October 6,
2020, Dr. Andrus reviewed both CT studies with Plaintiff.  Id.
Dr. Andrus noted that the cervical CT showed:

> moderate asymmetric left facet arthropathy at C3-4.
> Moderate to severe asymmetric left facet arthropathy
> C4-5.  At C5-6, there is moderate disc space narrowing
> with mild cord flattening without significant canal or
> foraminal stenosis.  At C7-T1, there is moderate
> asymmetric right facet arthropathy; no stenosis."

Id.  The Lumbar CT showed:

> solid-appearing fusion at L3-4.  Moderate to severe
> facet arthropathy at L4-5.  No significant canal or
> lateral recess narrowing.  Moderate right and mild
> left subarticular foraminal stenosis.  At L5-S1, three
> is mild degenerative changes without significant
> stenosis.  Mild changes of arachnoiditis at L3 through
> upper sacral canal.

Id.  During her appointment, Plaintiff had "no signs of
fainting, muscle weakness, numbness/tingling, loss of balance or

seizure disorder." (R. 609). Plaintiff had no gross muscoskeletal abnormalities except for tenderness of her lower lumbar paraspinals. (R. 611). She was alert and oriented, and her affect and mood were normal. Id. The radiologist who reviewed the cervical and lumbar CT myelogram found no evidence of high-grade cervical stenosis or impingement, "[d]egenerative spondylosis C5/6 with mild cord flattening without significant canal stenosis," "[n]o other significant canal stenosis," "[s]light scoliotic curvature with mild anterior spondylolisthesis C3/4, [] slight anterior listhesis C4/5," and other mild or moderate findings. (R. 687-93).

The following month, on October 19, 2020, Plaintiff had a lumbar facet joint injection, and on October 20, 2020, Plaintiff had SI joint injections. (R. 616, 618). Plaintiff met with Dr. Andrus on November 19, 2020. (R. 623). Plaintiff had "no signs of headaches, [or] dizziness." Id. She presented with joint pain, but had "no signs of anxiety, depression, bipolar disorder, memory loss or change in mood." Id. On physical examination, Plaintiff had "normal light touch sensation in the bilateral upper and lower limbs," "5/5 strength both proximally and distally in the bilateral upper and lower limbs," her upper motor neuron signs were "negative bilaterally with negative Hoffman sign in the hands," and her gait was nonantalgic with a normal base. (R. 625). Plaintiff had no gross abnormalities in

her range of motion or the stability of her head, neck, trunk, and all four extremities, "except for tenderness of the left gluteal musculature and sacral border" and "tenderness over the left medial ilium." Id. Dr. Andrus explained that:

> We have, again, discussed weight in relation to her SI joint symptoms today. I have encouraged her on diet and exercise.

(R. 626). On December 22, 2020, Plaintiff returned to Dr. Andrus. (R. 631). Plaintiff reported "that the iliolumbar ligament injection really helped," resulted in a 20% improvement, and "significantly improved her back pain." Id. Plaintiff still had back pain, but her gluteal symptoms improved. Id. She explained that her pain is continuous and an 8/10. Id. Plaintiff stated her pain "is worse with standing, walking and sitting," and "improves with lying down." Id. She had "no new numbness, tingling, weakness, bowel or bladder dysfunction." Id. She reported "severe functional deficits, but again report[ed] that she is doing better since the injection." Id. Plaintiff had no signs of headache, dizziness, double vision, or blurred vision. Id. She had no signs of anxiety or depression. Id. Plaintiff was alert and oriented, and her mood and affect were normal. (R. 633).

On March 3, 2021, Plaintiff had a lumbar facet injection. (R. 634-35). During a follow-up appointment with Dr. Andrus on March 23, 2021, Plaintiff reported that the injection resulted

in a 70% reduction in pain, but she was experiencing pain
"further down in the back." (R. 639).  Plaintiff complained of
pain in her legs and a "return of her neck pain."  Id.  She
described her pain as continuous, "aching, sharp, and nagging."
Id.  She explained that her pain level is an 8/10 when most
severe, and a 7/10 at its best.  Id.  She noted her pain "feels
best when she is able to apply heat and lie down," and it is
worst when standing, sitting, and walking.  Id.  Plaintiff
recently did household chores and felt "that she may have
exacerbated her symptoms."  Id.  Plaintiff denied "any new pain,
weakness, sensory loss, bower or bladder dysfunction."  Id.  She
reported "a significant amount of pain" during the appointment,
and noted moderate functional deficits with mood and walking
ability, and severe functional deficits with general activity,
normal work, relation with others, sleep and enjoyment of life.
Id.  Plaintiff had no signs of headaches, dizziness, hearing
loss, double vision, or blurred vision.  Id.  She had no signs
of anxiety or depression.  Id.  Her range of motion and
stability of her head, neck, trunk, and all four extremities
revealed no gross abnormalities "except for tenderness over the
cervical and the lumbar paraspinals."  Id.  She was tender over
the PSIS bilaterally.  (R. 641).  Plaintiff had "increased
discomfort with forward flexion and backward extension at the
waist which is somewhat limited."  Id.  She had "normal light

touch sensation in the bilateral upper and lower limbs, and 5/5 strength proximally and distally in the bilateral upper and lower limbs." Id. Her upper motor neuron signs were negative bilaterally, and her gait was nonantalgic with a normal base. Id. Plaintiff had a sleep study which showed "abnormal movement of her left eye." (R. 639). Dr. Andrus scheduled Plaintiff for lumbar, sacroiliac, and cervical injections, which were administered over the next month. (R. 641).

On March 5, 2021, Plaintiff saw Robert Snyder, M.D. and complained of left knee pain. (R. 636). She received an injection in her left knee. (R. 638). Plaintiff had a follow-up appointment with Dr. Andrus on May, 18, 2021, and reported that her neck pain was "doing much better" after her cervical injection, and her lumbar injection "helped with her leg and back pain." (R. 660). However, she reported numbness in her legs and continuous pain. Id. On examination, she had "no signs of headaches, dizziness, hearing loss ... double vision, blurry vision." Id. Dr. Andrus recommended they "transition her battery to Alpha-Stim." (R. 663).

On September 17, 2021, Plaintiff went to Sentara Family Medicine for a routine general medical examination. (R. 1406). Plaintiff complained of migraines, low back pain, asthma, and sleep apnea. (R. 1407). She reported "multiple episodes of falling asleep, intermittent twitches of R hand, chronic knee

pain, palpitations," and depression.   (R. 1407).   She noted a recent stressor was her strained relationship with her daughter. Id.

**B.   Opinion Testimony**

**1.   State Agency Consultant Nicolas Tulou M.D.**

On August 9, 2021, as part of Plaintiff's initial DIB determination, Nicolas Tulou, M.D., conducted a review of Plaintiff's medical records.   (R. 110).   Dr. Tulou found Plaintiff is obese and has spondylitis, migraines, and vertigo. Id.   He noted Plaintiff has a normal gait and normal range of motion.   Id.   Dr. Tulou found that Plaintiff has exertional limitations and can occasionally lift and or/carry (including upward pulling) ten pounds, frequently lift and/or carry (including upward pulling) less than ten pounds, and is unlimited in her ability to push and/or pull with her upper and lower extremities (other than lift and/or carry).   Id.   He concluded that Plaintiff can stand and/or walk for a total of two hours, and can sit for a total of six hours in an eight hour work day.   Id.

Dr. Tulou imposed postural limitations, including that Plaintiff can occasionally climb ramps/stairs, balance, stoop (i.e. bend at the waist), kneel, crouch (i.e. bend at the knees), and crawl.   Id.   He concluded that Plaintiff could never climb ladders, ropes, or scaffolds.   Id.   Dr. Tulou noted that

Plaintiff has no manipulative, visual or communicative limitations. Id. But, she does have environmental limitations and should avoid concentrated exposure to extreme cold, noise, and vibration. Id. Plaintiff should avoid even moderate exposure to hazards including machinery and height. Id.

### 2. Jack Hutcheson, J.R., M.D.

At the reconsideration level, Jack Hutcheson, Jr., M.D. reviewed Plaintiff's medical record and found that she can perform work at the sedentary level. (R. 121). Dr. Hutcheson found that Plaintiff has exertional limitations and can occasionally lift and/or carry (including upward pulling) ten pounds, and frequently lift and/or carry (including upward pulling) less than ten pounds. Id. He noted that Plaintiff was unlimited, other than lift and/or carry, in her ability to push and/or pull in her upper and lower extremities. Id. Dr. Hutcheson concluded that Plaintiff can stand and/or walk (with normal breaks) for a total of two hours, and sit (with normal breaks) for about six hours in an eight-hour work day. Id. He found that Plaintiff can frequently climb ramps/stairs, balance, and kneel, but can only occasionally stoop, crouch, and crawl. (R. 122). He concluded Plaintiff could never climb ladders, ropes, or scaffolds. Id. Dr. Hutcheson found that Plaintiff has no manipulative or visual limitations, but has environmental limitations. Id. She should avoid concentrated exposure to

31

fumes, odors, dusts, gases, poor ventilation, etc., and avoid all exposure to hazards (machines, heights, etc.).  (R. 122).

## C.   Testimony Before the ALJ

The ALJ questioned Plaintiff at the hearing on June 13, 2022.  (R. 51).  The ALJ also heard testimony from the VE, Steven Gumerman.  (R. 49).

### 1.   Plaintiff's Testimony

On direct questioning by the ALJ, Plaintiff testified that she is married, and she has a thirty-six-year-old daughter.  (R. 55-56).  Plaintiff lives with her husband, and she stopped driving in 2018 because of her vertigo.  (R. 55-56).  Plaintiff testified that she has a high school education.  (R. 57).

The ALJ then reviewed Plaintiff's work history and asked about her past experiences.  (R. 57).  Plaintiff testified that she worked as a bank teller at Bank of America.  (R. 56-58). She noted that she became the head teller around 1997 and was required to "lift quite a lot because [they] would get shipments in and [she] was responsible for putting the shipments in the vault."  (R. 57).  She noted that the bags typically weighed more than twenty pounds.  Id.  Plaintiff was also responsible for supervising other tellers and scheduling.  (R. 57-58). Plaintiff next worked at Brinco Federal Credit Union as a bank teller, but stopped working there after she was in a car accident.  (R. 58).  She testified that her job duties included

32

lifting and carrying coin bags that weighed around 20 pounds. Id.  Plaintiff testified that she has not worked since 2016, and her husband pays most of the bills.  (R. 59).

Plaintiff then discussed her medical issues and explained that she has two types of migraines—chronic migraines and "really bad migraines that hit [her] all of a sudden where [she] just can't function."  (R. 60).  Plaintiff explained that she must "go lay in a quiet spot ... in the dark."  Id.  Plaintiff testified that she has "chronic migraines" every day that she takes medication to treat.  Id.  She noted that her other headaches occur "once or twice a week, if not more."  (R. 61). Plaintiff stated she is not sure what triggers these headaches. Id.  She explained that she sometimes lies down "all day" and "keep[s] popping pills" for relief.  Id.  She testified that when her husband is at work, she is alone but he "works up the road," and can come if she needs help.  Id.  Plaintiff stated that she wakes up with a headache, and her medication eases her pain.  (R. 60-61).

Plaintiff testified that she has episodes of passing out. (R. 62).  She explained that "[w]hat usually happens is my eyes start going ... [t]hey start fluttering back and forth real bad and then all of a sudden I just go out.  But normally I'm sitting on the ... sofa and ... I'll end up falling back on the sofa and I don't respond anymore."  Id.  Plaintiff explained

that these episodes "last a few minutes to a few hours."   Id.
She explained that she comes out of the episode herself, or her
husband wakes her by shaking her shoulders.   Id.   She further
noted that she takes medication for her vertigo, but still has
"dizzy spells but ... not as bad as they were, and she is not
nauseous."   (R. 63).   She testified that she does not do
housework during the day, and her husband cooks or they eat out.
Id.   Plaintiff testified that she showers with her husband, and
she must sit down on her bed to get dressed.   (R. 64).

Plaintiff testified that she went to Florida in 2021 for
her granddaughter's birthday.   (R. 64).   Plaintiff's husband
drove her to Florida, and "he came back and picked [her] up" two
days later.   Id.   Plaintiff testified that her daughter helped
her when she was in Florida, and she slept "a lot" during the
day.   (R. 65).

Regarding her activities of daily living, Plaintiff
testified that her husband often starts the laundry and brings
it to her to fold.   (R. 66).   Plaintiff watches television but
testified that she cannot concentrate.   Id.   She stated she
"can't even read books."   Id.   Plaintiff noted that she orders
groceries, clothes, and other household items online.   (R. 66-
67).   Plaintiff explained that "Monica" prescribed her a scooter
that she uses when shopping outside of her home.   (R. 67).   She

noted that she cannot "walk very far" because her "legs are so week," and she has fallen in her home.  Id.

Plaintiff's attorney then asked additional follow-up questions, and Plaintiff explained that her "eyes [go] crazy back and forth," before she experiences "the seizure-like activities."  (R. 68).  Plaintiff testified that her doctors do not know the cause of her "seizure-like activities" or blurred vision.  Id.  Plaintiff noted that she has a tremor in both of her hands that raises problems with gross and fine manipulation. (R. 70).  She stated it "would be kind of hard" for her to sit down and write a letter because her hands twitch, and it would be difficult for others to understand her writing.  (R. 70-71). Plaintiff noted that she has right shoulder issues, but she had an injection that helped.  (R. 71).  Finally, Plaintiff testified that she has gained weight in the past year, and she is unable to exercise.  (R. 72-73).

## 2.  Testimony from the VE

The VE characterized Plaintiff's prior work as positions in financial institutions.  (R. 74).  Specifically, the VE classified Plaintiff's job as a teller (DOT 211.362-018) with a light exertion level and SVP 5.  Id.  The VE classified Plaintiff's other job as a head teller (DOT 211.132-010) with a light exertion level and SVP 8.  Id.  The VE noted that "as performed, which is not terribly uncommon, the weights can

exceed 20 pounds.   And in that event, it can push the exertional

limits into the medium exertional category."   (R. 74).   The VE

explained that these jobs provided Plaintiff with transferable

"data entry-type skills at the sedentary level."   (R. 75).   The

VE testified that Plaintiff could perform "data entry jobs,"

with an SVP of "3/4 roughly."   (R. 75).   The ALJ then asked the

VE the following hypothetical:

> Let me assume that the person -- the claimant could
> perform sedentary jobs.   Could frequently climb ramps
> and stairs.   Never climb ladders, ropes, and
> scaffolds.   Frequently balance, occasionally stoop.
> Frequently kneel, occasionally crouch or crawl.   Never
> be exposed to unprotected heights, moving mechanical
> parts.   And occasionally be exposed to dust, odors,
> fumes, and pulmonary irritants.   Would there be jobs
> that will transfer with that RFC?

(R. 76).   The VE testified that the hypothetical person could

work as a data entry clerk (DOT 203.582-054) with over 100,000

jobs nationally, registration clerk (DOT 205.367-042) with

50,000 jobs nationally, and an information clerk (DOT 237.367-

022) with 65,000 jobs nationally.   Id.   The VE then explained

the handling and fingering in each of these jobs:

> for the information clerk, it's occasional reaching
> and handling.   Fingering, although, it's not listed,
> would probably be similar, occasional to frequent.
> Moving backward to the job as a registration clerk ...
> frequent for reaching and handling and occasionally
> for fingering.   Then for ... data entry clerk, the
> reaching and handling is frequent, and the fingering
> is constant.

(R. 77). The ALJ asked if "the claimant could only reach overhead with her dominant arm frequently, how would that affect the ability to perform these three jobs?" (R. 77). The VE stated that "based on experience, since this is not a specific issue addressed by the DOT, there certainly could be some overhead reaching, but it would not exceed more than one-third of the workday at the most. And it could be done with one extremity." Id. The ALJ then asked if the "claimant needed a scooter [i.e. an electric-powered wheelchair] to move around, how would that ... affect the availability of work?" Id. The VE answered:

> in instances like that where there's some type of equipment, device, or any type of unit that is powered that's needed, the job as a data entry clerk could probably be performed. I mean, in some respects, all of the jobs could be performed if the person is using a scooter. But I think that what would most likely happen is that there would be some accommodations needed for time issues and so forth, especially if the person is going to be having to transfer back and forth from the seat to scooter.
> ***
> I should note that in all of these sedentary jobs, there is some walking that could be necessary. For example, in the job as a registration clerk, the person -- much like an information clerk, the individual could be moving from a station -- from station to station up to a third of the workday. So, that could be another area where although the job could be performed, I think we'd be talking about some accommodations that might be needed for space and so forth.

(R. 78). The VE testified that for these jobs, a maximum of 15% off-task work and one absence per month would be acceptable.

(R. 79).   In response to a question posed by Plaintiff's attorney, the VE explained that if the individual was limited to simple and routine tasks, the person could only perform "unskilled jobs and that would eliminate the alternatives that [he] listed."   Id.

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.   42 U.S.C. § 405(g); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)).   It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.   <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.   <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456.   "Where

conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." _Craig_, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. _Perales_, 402 U.S. at 390; _see also_ _Lewis v. Berryhill_, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. _Coffman v. Bowen_, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

Plaintiff argues that the ALJ failed to properly evaluate her subjective complaints pursuant to SSR 16-3p and prevailing law, and failed to explain why her migraines did not meet or medically equal Listing 11.02. Pl.'s Mem. (ECF No. 13, at 1, 11-19). Plaintiff also contends that the ALJ did not discuss how her migraines were considered in formulating the RFC. _Id._ at 15. Accordingly, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. _Id._ at 1, 12, 19). The Commissioner contends that the ALJ complied with applicable law, and substantial evidence supports her decision. Def.'s Br. (ECF No. 14, at 19-28). The Commissioner

also argues that the ALJ properly analyzed Plaintiff's migraines under the Listings and adequately considered her migraines in formulating the RFC. Id. at 26-28. For the reasons explained below, I agree with the Commissioner and find no error in the ALJ's decision. This Report concludes that remand is not warranted, and recommends that the court affirm the Commissioner's decision.

A.   **Framework for SSA Disability Evaluation.**

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d). As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a).

An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). SSA regulations set out a sequential

analysis which ALJs use to make their determination. 20 C.F.R. §
404.1520(a)(4).  Specifically, the regulations direct the ALJ to
answer the following five questions:

1.    Is the individual involved in substantial gainful
      activity?

2.    Does the individual suffer from a severe impairment
      or a combination of impairments that meets the
      durational requirement and significantly limits his
      or her physical or mental ability to do basic work
      activities?

3.    Does the individual suffer from an impairment(s)
      that meets or equals a listing in 20 C.F.R. Pt.
      404, Subpt. P, App. 1 (a "listed impairment") and
      meets the durational requirement?

4.    Does the individual's impairment or combination of
      impairments prevent him or her from performing any
      relevant past work?

5.    Does the individual's impairment or combination of
      impairments prevent him or her from performing any
      other work?

An affirmative answer to question one, or a negative answer
to questions two, four, or five, means the claimant is not
disabled.  An affirmative answer to questions three or five
establishes disability.  The claimant bears the burden of proof
during the first four steps; if the analysis reaches step five,
the burden shifts to the Commissioner to show that other work
suitable to the claimant is available in the national economy.
See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v.

41

Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(3); 404.1520b.  This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age."  Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)).  Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.    The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity "during the period from November 1, 2018, which is the day after the prior unfavorable Administrative Law Judge decision ... through December 31, 2021, the date last insured."  (R. 21).  At step two, the ALJ found that Plaintiff suffered from the following severe impairments:

> status post L3-L4 XLIF interbody spacer with solid
> osseous fusion by September 26, 2018 (Exhibit B7F);
> facet arthropathy and mild anterior listhesis of L4-L5
> (Exhibit B3F); status post spinal cord stimulator
> (SCS) placement on February 14, 2017, and SCS battery

exchange on January 10, 2022 (Exhibit B14F); obesity (Exhibit B11F); small tears in the medial compartments of both knees and full-thickness cartilage loss in the weightbearing areas both medially and laterally in both knees by February 24, 2022 (Exhibit B14F); minimal tricompartmental osteoarthritic degenerative changes of the left knee (Exhibit B7F); mild anterior listhesis of C3-C4 and C4-C5 levels (Exhibit B7F); mild multilevel degenerative changes of the cervical spine (Exhibit B7F); and migraines (Exhibit B10F) (20 CFR 404.1520(c)).

(R. 21). At step three, the ALJ found that through December 31, 2021—Plaintiff's last date insured—she did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 25). The ALJ developed a finding regarding Plaintiff's RFC, and determined that Plaintiff, through her last date insured, could perform sedentary work with the following limitations:

the claimant was able to frequently climb ramps and stairs; the claimant was never able to climb ladders, ropes, and scaffolds; the claimant was able to frequently balance; the claimant was able to occasionally stoop; the claimant was able to frequently kneel; the claimant was able to occasionally crouch and crawl; the claimant was never able to be exposed to unprotected heights, moving mechanical parts; and the claimant was occasionally able to be exposed to dusts, odor, fumes, and pulmonary irritants.

(R. 28). At step four, the ALJ concluded that through December 31, 2021, Plaintiff was unable to perform any past relevant work. (R. 37). At step five, the ALJ found work in the national economy Plaintiff could perform and therefore found that she was not disabled. (R. 37–38).

C.  **The ALJ's Analysis Complies with the Controlling
    Regulations and is Supported by Substantial Evidence.**

Plaintiff argues the ALJ's decision is not supported by
substantial evidence "because the ALJ did not properly evaluate
Plaintiff's subjective complaints of pain pursuant to SSR 16-3p
and prevailing law." Pl.'s Mem. (ECF No. 13, at 1). Plaintiff
alleges that "the ALJ merely summarizes the record but never
provides an explanation as to why Plaintiff's subjective
complaints of pain were discounted by the record." Id. at 13.
Plaintiff also claims that the ALJ failed to explain why her
migraines did not meet or medically equal Listing 11.02 of the
Listings, Appendix 1 to Subpart P, 20 C.F.R. Part 404, and
failed to explain how Plaintiff's migraines were considered in
the formulation of Plaintiff's RFC. Id. at 14-16. The
Commissioner argues that "the ALJ properly evaluated Plaintiff's
subjective complaints of pain in accordance with controlling
law, and adequately explained how and why Plaintiff's statements
concerning the intensity, persistence, and limiting effects of
her symptoms were not entirely consistent with the medical
evidence in the record." Def.'s Opp'n (ECF No. 14, at 19). The
Commissioner also contends that "the ALJ properly analyzed
Plaintiff's migraine headaches under the Listings, and
adequately considered and evaluated Plaintiff's migraine
headaches in formulating her RFC." Id. Because the ALJ's

44

evaluation of Plaintiff's subjective complaints was appropriate and consistent with SSA regulations, and the ALJ adequately considered Plaintiff's migraines under the Listings and in the RFC, this Report concludes that remand is not warranted and recommends that the court affirm the Commissioner's decision.

### 1. The ALJ Properly Considered Plaintiff's Subjective Complaints of Pain.

Plaintiff argues that the ALJ improperly discounted her subjective complaints of pain and this error runs afoul of Arakas v. Comm'r, SSA, 983 F.3d 83, 95 (4th Cir. 2020). The ALJ found that Plaintiff impairments could have caused the alleged symptoms, but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other medical evidence in the record." (R. 29). Substantial evidence supports her finding.

In Arakas, the Fourth Circuit emphasized that, after the ALJ finds that the claimant's impairment could produce symptoms, the ALJ "may not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate them." Arakas, 983 F.3d at 95 (quoting SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *4-5 (Mar. 16, 2016)) (cleaned up). But Arakas concerned a very specific diagnoses of fibromyalgia,

a disease that the ALJ misunderstood and only cursorily addressed. See id. at 98; see also Donta J. v. Saul, No. 2:20CV131, 2021 U.S. Dist. LEXIS 123735, 2021 WL 2711467, at *3 (E.D. Va. July 1, 2021) (distinguishing Arakas because the ALJ "listed the reasons for his decision"). In this case, has not been diagnosed with fibromyalgia. Instead, her complaints of pain related to documented physical impairments in her neck, back, head, and knees. The ALJ provided a detailed narrative discussing Plaintiff's subjective complaints:

> During the hearing, the claimant testified that she is currently not working. She testified that she lives in a house with her husband. The claimant testified that she stopped driving after she was diagnosed with vertigo in 2016. She testified that she takes numerous medications for her alleged impairments. The claimant testified that she has chronic migraines every day. She testified that her medications ease the pain from her migraines. The claimant testified that she wakes up with headaches. She testified that she passes out frequently. The claimant testified that she still has dizzy spells even after she takes her medications. She testified that she cannot function, and her husband does most of the household chores. The claimant testified that she has trouble showering and getting dressed. She testified that she went to Florida in 2021. The claimant testified that she sleeps a lot during the day. She testified that she has trouble concentrating and remembering things. The claimant testified that her husband got her a scooter, which was prescribed by a doctor. She testified that she uses the scooter for long distances. The claimant testified that she experiences tremors in both hands, and she experiences numbness in both hands. She testified that she has trouble with fine manipulation. The claimant testified that her blood pressure is uncontrolled. She testified that she has problems with her right shoulder. She testified that she has back problems

> and leg problems.   She testified that she gained
> weight in the last year.   The claimant testified that
> she had gastric bypass surgery in the past.   She also
> testified that she is unable to exercise.

(R.  29).    After reviewing the medical evidence and other

evidence in the record related to these complaints, the ALJ

explained that Plaintiff had an extensive record of diagnoses

and treatment for disorders of her lumbar and cervical spine as

well as her knees through her DLI.   But she then observed—and

cited to—a history of relatively mild or moderate objective

findings:

> However, the objective examinations, includes PEs, x-
> rays, MRIs, CT scans, and EEGs, indicate mostly
> normal/mild/moderate findings overall, through
> December 31, 2021, the date last insured (Exhibits B1F
> - B12F and B16F - B18F).

(R.  32).    The ALJ also specifically observed that these

diagnosed conditions generally responded to treatment prescribed

by Plaintiff's doctors.   Id.

> In addition, the claimant's impairments remained
> stable or improved at least somewhat with treatment,
> including medications and injections, through December
> 31, 2021, the date last insured (Exhibits B1F - B12F
> and B16F - B18F).

Id.   The ALJ also noted Plaintiff's own self report of travel,

as an additional reason to partially discredit her subjective

complaints.   Id.

> Furthermore, the claimant traveled to Florida in
> January 2021 (Exhibit B5F).   Therefore, the
> undersigned finds that, through December 31, 2021, the
> date last insured, the claimant had the residual

> functional capacity to perform less than the full
> range of sedentary work (mentioned above).
>
> The medical evidence discussed above shows that the
> claimant's allegations of disabling impairments, which
> are found in the claimant's disability reports and
> hearing testimony, are inconsistent with objective
> findings and subjective findings on examinations,
> through December 31, 2021 ....

(R. 32).   Plaintiff insists that the ALJ uses boilerplate

language and "merely summarizes the record but never provides an

explanation as to why Plaintiff's subjective complaints of pain

were discounted by the record."  Pl.'s Mem. (ECF No. 13, at 13).

But, as evidenced above, the ALJ clearly enumerated all

evidence, objective and subjective, she considered when making

her decision.  See 404.1545(a)(1), 404.1529(a).  Elsewhere in

her opinion, the ALJ provided additional specific examples where

she explicitly reasoned that Plaintiff's subjective complaints

were inconsistent with the objective evidence in the medical

record:

> A PE [physical examination] from April 18, 2022,
> indicated that the claimant had 5/5 strength both
> proximally and distally in the bilateral upper and
> lower limbs, as well as nonantalgic gait with a normal
> base (Exhibit B14F).   This undercuts claimant's
> hearing testimony that she is normally on the sofa.
> ***
> The claimant's neurologist thought that it could be
> possible that the claimant has complex partial seizure
> (Exhibit B17F), apparently based on the claimant's
> statements.   However, the claimant's neurologist has
> not found any objective medical evidence to support
> this (Exhibit B17F).
> ***

> As to episodes of passing out, the claimant was not following up with cardiology, despite a recommendation from a neurologist (Exhibit B17F).  A new patient cardiology evaluation from October 18, 2-21, indicates that Ms. Ashley Rice, a nurse practitioner (NP), thought that the claimant's syncopal spells sound more neurological with nystagmus prior to passing out (Exhibit B12F).  The claimant's neurologist did not mention observing any "eye movement" issues or confirm the claimant's allegation of slurred speech (Exhibit B17F).  Furthermore, there is no medical evidence to support the claimant's claim of periods of loss of consciousness (LOC), despite extensive neurological workup and doctor observations at visits.

(R. 31, 32).  While these specific observations support the ALJ's decision to partially discredit Plaintiff's testimony, those subjective complaints were still relevant to determining Plaintiff's RFC.  The ALJ considered all of the evidence in the record, partially credited her subjective complaints, and concluded that Plaintiff had the RFC to perform sedentary work—the lowest exertion level of work under the regulations.  She also imposed additional restrictions to account for her other impairments.  (R. 28)

The Court is also not persuaded by Plaintiff's argument that the ALJ cherry-picked or "dumbs [] down" Plaintiff's subjective complaints "to appear less severe than" they are. Pl.'s Mem. (ECF No. 13, at 16).  An ALJ is not "obliged to accept, without more, [a claimant's] subjective assertions of disabling pain and her subjective assessment of the degree of that pain." Craig, 76 F.3d at 591; Tonya D. v. Kijakazi, No.

7:20-CV-777, 2022 U.S. Dist. LEXIS 45738, 2022 WL 1126623, at
*7-8 (W.D. Va. Feb. 7, 2022).   Nor is the ALJ "required to make
specific findings related to each of [the claimant's] subjective
assertions."   Tonya D., 2022 U.S. Dist. LEXIS 45738, 2022 WL
1126623, at *7 (citing Shinaberry v. Saul, 952 F.3d 113 (4th
Cir. 2020)).   Here, in reaching her conclusion, the ALJ
thoroughly detailed the medical record in support of her RFC
findings and highlighted numerous pieces of evidence
contradicting Plaintiff's subjective complaints of pain.   See
infra at 45-48; (R. 29-32).   Thus, the ALJ properly evaluated
Plaintiff's subjective complaints, see Paulette B. v. Kijakazi,
No. CBD-20-3691, 2022 U.S. Dist. LEXIS 53667, 2022 WL 888423, at
*6 (D. Md. Mar. 24, 2022) (affirming when "the ALJ considered
many factors when determining Plaintiff's RFC, and thus did not
require Plaintiff to prove her subjective complaints by
objective medical evidence").

    **2.   The ALJ Properly Evaluated and Considered Plaintiff's
Migraine Headaches when Crafting the RFC.**

    Plaintiff argues that the ALJ failed to explain why her
migraines did not meet or equal the Listings, particularly
Listing 11.02(B), and "the decision is void of any discussion of
how migraines were considered in the formulation of the RFC."
Pl.'s Am. Br. (ECF No. 13, at 15).   Listing 11.02 applies to
epilepsy, but because there is no separate listing for migraines

or headaches, courts routinely apply Listing 11.02 when
analyzing a claimant's migraine-related impairments. <u>See</u>
<u>Juanita D.J. v. Comm'r SSA</u>, No. 4:22-cv-64, 2021 WL 3941997.
2023 U.S. Dist. LEXIS 101853, at *34 (E.D. Va., May 8, 2023).
Listing 11.02 requires evidence of epilepsy or an equivalent
impairment with a detailed description of a typical seizure and
evidence of either:

> A. Generalized tonic-clonic seizures (see 11.00H1a),7
> occurring at least once a month for at least 3
> consecutive months (see 11.00H4)8 despite adherence to
> prescribed treatment (see 11.00C); or
>
> B. Dyscognitive seizures (see 11.00H1b), occurring at
> least once a week for at least 3 consecutive months
> (see 11.00H4) despite adherence to prescribed
> treatment (see 11.00C); or
>
> C. Generalized tonic-clonic seizures (see 11.001-11a),
> occurring at least once every 2 months for at least 4
> consecutive months (see 11.00H4) despite adherence to
> prescribed treatment (see 11.00C); and a marked
> limitation in one of the following: 1. Physical
> functioning (see 11.00G3a); or 2. Understanding,
> remembering, or applying information (see
> 11.00G3b(i)); or 3. Interacting with others (see
> 11.00G3b(ii)); or 4. Concentrating, persisting, or
> maintaining pace (see 11.00G3b(iii)); or 5. Adapting
> and managing oneself (see 11.00G3b(iv)); or
>
> D. Dyscognitive seizures (see 11.00H lb), occurring at
> least once every 2 weeks for at least 3 consecutive
> months (see 11.00H4) despite adherence to prescribed
> treatment (see 11.00C); and [*13] a marked limitation
> in one of the following: 1. Physical functioning (see
> 11.00G3a); or 2. Understanding, remembering, or
> applying information (see 11.00G3b(i)); or 3.
> Interacting with others (see 11.00G3b(ii)); or 4.
> Concentrating, persisting, or maintaining pace (see
> 11.00G3b(iii)); or 5. Adapting and managing oneself
> (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.02(A)-(D); see Davis v. Saul, No. 3:18-cv-461, 2019 U.S. Dist. LEXIS 116663, at *11-12 (E.D. Va. June 15, 2019), report and recommendation adopted, 2019 U.S. Dist. LEXIS 116279 (E.D. Va. July 11, 2019).  Here, the ALJ determined that Plaintiff's mental and physical impairments, either individually or in combination, did not meet or medially equal a listed impairment, writing:

> The claimant's impairments were evaluated under section 1.00 Muscoskeletal Disorders and section 11.00 Neurological disorders, giving consideration to the combined effects of obesity in accordance with SSR 19-2p.  Although severe, these impairments were not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments, Appendix 1 to Subpart P, 20 CFR Part 404.

(R. 25).  The ALJ specifically considered Listing 11.02 and determined that:

> In the absence of evidence of epilepsy, documented by a detailed description of a typical seizure, and characterized by A, B, C, or D, as defined in listing 11.02, the undersigned finds that the claimant's migraines (Exhibit 10F) did not reach the severity of the listing, through December 31, 2021, the date last insured.

(R. 27).  The ALJ also explained that she "considered and applied SSR 19-4p - evaluating headaches involving primary headache disorders," and concluded that Plaintiff did not meet the criteria therein and "there is no evidence of complications

from headaches affecting any body system to a degree that
medically equals a listing." Id.

Plaintiff insists that there is ample evidence to support a
finding that her migraines meet Listing 11.02. Pl.'s Mem. (ECF
No. 13, at 15-18). But, nearly all of counsel's citations to
the record involve Plaintiff's self-reports of matters already
considered by the ALJ. Pl.'s Mem. (ECF No. 13, at 14—16)
(citing, for example, Plaintiff's Headache Questionnaire, her
hearing testimony, and her self-reports included in medical
treatment notes). When objective measures are cited—such as the
ambulatory EEG—they do not support Plaintiff's self-report. See
(R. 1382)(the ambulatory EEG "captured several events
nonepileptic in nature.").

Reward is not warranted simply because the record contains
evidence which could support a conclusion opposite from the one
reached by the ALJ. The court must defer to the ALJ's findings
if those findings are supported by substantial evidence.
Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865. This
appeal is not an opportunity to relitigate the case. If
"conflicting evidence allows reasonable minds to differ as to
whether [Plaintiff] is disabled," then the court defers to the
ALJ. Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d
635, 640 (7th Cir. 1987)). Because the ALJ's opinion here is

supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

The ALJ adequately considered Plaintiff's migraine headaches when formulating the RFC. The ALJ reviewed Plaintiff's allegations of migraine-related pain, her treatment, and how her pain impacted her activities of daily living. (R. 29-35). For example, the ALJ considered Plaintiff's testimony about her chronic migraines, including that she "takes numerous medications," she "wakes up with headaches," and she "cannot function." (R. 29) (citing R. 59-66). But the ALJ also reviewed Plaintiff's medical record, and observed that "[p]rogress notes from December 2, 2019, indicate that the claimant's headache/vertigo was stable on Cymbalta and Fiorinol (Exhibit B7F)," "the objective examinations, including PEs, x-rays, MRIs, CT scans, and EEGs, indicate mostly normal/mild/moderate findings overall ...(Exhibits B1F – B12F and B16F – B18F)," and "the claimant's impairments remained stable or improved at least somewhat with treatment, including medications and injections ... (Exhibits B1F - B12F and B16F - B18F)." (R. 32) (citing R. 1092, 1477-78, 1553-54, 1557, 1560, 1632, 1638, 1790, 1804, 1808). The ALJ also observed that Plaintiff "traveled to Florida in January 2021 (Exhibit B5F)." (R. 29, 34) (citing 838). Ultimately, the ALJ concluded that Plaintiff could perform sedentary work with limitations. (R.

28).  Under these circumstances, the ALJ adequately considered
Plaintiff's migraines and the RFC is supported by substantial
evidence.

Further, when explaining her RFC determination, the ALJ
also "considered the medical opinion(s) and prior administrative
medical finding(s) in accordance with the requirements of 20 CFR
404.1520c."  (R. 28).  Specifically, the ALJ reviewed Dr.
Goldberg's medical source statement—the only treating source
statement provided in the record.  Dr. Goldberg's statement
imposed severe limitations.  Even though it was rendered after
the DLI, the ALJ evaluated it carefully, eventually concluding
that his opinion was "not persuasive, because it is not
supported by Dr. Goldberg's examination findings in Exhibit
B10F, through December 31, 2021, the date last insured, and
because it is not consistent with the evidence of record as a
whole," through Plaintiff's DLI.  (R. 35).  In reaching this
conclusion, the ALJ provided a lengthy review of Dr. Goldberg's
opinion and treatment notes:

> On July 1, 2022, Dr. Goldberg basically opined that
> the claimant has severe/extreme limitations, and the
> claimant is essentially disabled (Exhibit B15F).
> However, there is no evidence of a memory impairment
> or limitation in hand or gross manipulation noted by
> Dr. Goldberg or by any other doctor.  The claimant is
> supposedly in severe pain (hearing testimony), but she
> is not seeing a pain doctor, and the medications that
> her doctor is prescribing are dealing primarily with
> her migraines (Exhibits 10F and B17F).  Furthermore, a
> PE from April 18, 2022, indicates that the claimant

had 5/5 strength both proximally and distally in the
bilateral upper and lower limbs, as well as
nonantalgic gait with a normal base (Exhibit B14F).

***

[T]he objective examinations, including PEs, x-rays,
MRIs, CT scans, and EEGs, indicate mostly
normal/mild/moderate findings overall, through
December 31, 2021, the date last insured. (Exhibits
B1F — B12F and B16F — B18F). In addition, the
claimant's impairments remained stable or improved at
least somewhat with treatment, including medications
and injections ... Furthermore, the claimant traveled
to Florida in January 2021. (Exhibit B5F)

(R. 35). Importantly, Plaintiff does not dispute the ALJ's
evaluation of Dr. Goldberg's opinion in her briefing here. Nor
does she contend that the ALJ assigned an improper weight to his
medical opinion.

Similarly, Plaintiff did not challenge her prior
unfavorable ALJ decision in federal court, nor does she
presently take issue with the ALJ's evaluation of that decision.[9]
Here, the ALJ gave "great weight to the prior unfavorable" ALJ
decision, "because it is largely supported by the evidence in
Exhibit B1A [the previous ALJ determination], and because it is
largely consistent with the evidence of record as a whole"
through Plaintiff's DLI. (R. 33). The ALJ then dedicated
nearly an entire page to a discussion of the prior unfavorable

---

[9] When discussing the prior unfavorable decision, the ALJ correctly noted
that: "[t]he SSA interprets the decision by the Court of Appeals in Albright
to hold that where a final decision by an Administrative Law Judge or the
Appeals Council after a hearing on a prior disability claim contains a
finding required at a step in the sequential evaluation process for
determining disability, the SSA must consider such a finding as evidence and
give it appropriate weight in light of all relevant facts and circumstances
when adjudicating a subsequent disability claim involving an unadjudicated
period." (R. 32–33).

decision, the evidence relied on, and any distinctions between the prior decision and her present RFC determination. See (R. 33-34).

Ultimately, and consistent with the prior determination (R. 89), the ALJ concluded that Plaintiff could perform sedentary work with limitations. (R. 28). The impairments Plaintiff raised in the prior unfavorable determination were nearly the same as those presented in this later period, including migraines, vertigo, status post lumbar fusion, post laminectomy syndrome, and obesity. (R. 38, 86). The treatment she received during the current adjudicative period is nearly the same as she underwent previously, including treatment by her neurologist Dr. Goldberg since at least 2015. (R. 90). Under these circumstances, the ALJ adequately considered Plaintiff's migraines and other impairments, and the RFC is supported by substantial evidence.

### V.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court DENY Plaintiff's Motion for Summary Judgment (ECF No. 9), and AFFIRM the Commissioner's finding of no disability.

### VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 27, 2024